IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

LANDFALL TRUST LLC,       )
     Plaintiff,              )
                         )
        v.               )          Civil Action No. 3:22CV194 (RCY)
                         )
FIDELITY NATIONAL TITLE    )
INSURANCE COMPANY,       )
     Defendant.            )
                         )

## MEMORANDUM OPINION

This is a breach of contract case arising from a title insurance policy held by Plaintiff Landfall Trust LLC and issued by Defendant Fidelity National Title Insurance Company.  Plaintiff alleges that Defendant breached the policy contract in part by failing to compensate Plaintiff for losses allegedly covered under the policy.  The case is presently before the Court on the parties' renewed cross-motions for summary judgment.  The matters in the renewed cross-motions have been fully briefed, and the Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and argument would not aid the decisional process.  E.D. Va. Loc. Civ. R. 7(J).  For the reasons stated below, the Court will grant Plaintiff's Motion for Summary Judgment, ECF No. 136, and deny Defendant's Motion for Summary Judgment, ECF No. 137.  The question of damages remains.

## I.  BACKGROUND

In reviewing cross-motions for summary judgment, the Court will consider each motion separately on its own merits to determine if either party deserves judgment as a matter of law. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (citations omitted).  In considering each motion, the Court will exercise great care to resolve any factual disputes and "competing, rational

inferences" in the light most favorable to the opposing party.  *Id*. (internal quotation marks and citation omitted).

At the outset, the Court notes that both Plaintiff's Memorandum in support of its motion, ECF No. 136, and its Reply Memorandum in opposition to Defendant's renewed motion, ECF No. 139, fail to include specifically captioned sections listing all material facts as to which it contends are undisputed or genuinely in dispute, respectively, as required by E.D. Va. Loc. Civ. R. 56(B)[1] and consistent with Fed. R. Civ. P. 56(c)(1).  Under the Local Rules, the Court may accept those facts identified by the movant as undisputed to be admitted, as well as assume admitted those facts not disputed by reference to record evidence.  E.D. Va. Loc. Civ. R. 56(B).  Despite Plaintiff's failure to set forth such designations, this Court has made a reasonable effort to search the record in an attempt to identify those facts that are genuinely in dispute and those that are undisputed.[2]  Where appropriate, however, the Court reserves the right to consider Defendant's statement of the facts as undisputed, as permitted by the Local Rules and Fed. R. Civ. P. 56(e).

---

[1] Local Rule 56(B) provides:

> Each brief in support of a motion for summary judgment shall include a specifically captioned section listing all material facts as to which the moving party contends there is no genuine issue and citing the parts of the record relied on to support the listed facts as alleged to be undisputed.  A brief in response to such a motion shall include a specifically captioned section listing all material facts as to which it is contended that there exists a genuine issue necessary to be litigated *and citing the parts of the record relied on to support the facts alleged to be in dispute*.  In determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its listing of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion.

E.D. Va. Loc. Civ. R. 56(B) (emphasis added).  This practice is consistent with the 2011 amendments to the Federal Rules of Civil Procedure, which require the parties to support their factual assertions by "citing to particular parts of materials in the record."  Fed. R. Civ. P. 56(c); *see also Campbell v. Verizon Virginia, Inc*., 812 F. Supp. 2d 748, 759 n.5 (E.D. Va. 2011) (discussing 2011 amendments to Rule 56), *aff'd* 474 F. App'x 167 (4th Cir. June 18, 2012).

[2] For example, the Court will, where appropriate, refer to the Plaintiff's Memorandum in Support of its prior summary judgment motion, ECF No. 98, which did include a specifically captioned section listing undisputed facts.

The Court has concluded that the following narrative represents the relevant undisputed facts for the purpose of resolving the instant cross-motions for summary judgment:

**A. The Henry's Island Development**

In 2002, real estate developers (the "Developers") sought to develop property in Lancaster County, Virginia, known as "Henry's Island." Aff. Ray Aaronian ¶ 12, ECF No. 91. The Developers also formed and were members of Dominion Land investments, L.L.C. ("Dominion"). *Id.* The Developers, as the "Declarant," recorded a "Declaration of Covenants, Conditions and Restrictions for Henry's Island" ("HOA Declaration" or "Declaration"), ECF No. 91-4, which included attached plats that showed the development area split into Lots 1 through 10 ("Plats"), including the relevant subdivided Lots 9 and 10. *See* Plats, ECF No. 91-3. As part of that development, the Developers subdivided the property into multiple lots, created land use restrictions, and provided easements for roads, common areas, and utilities. *See generally* Declaration. The Declaration also created the Henry's Island Homeowners Association (the "HOA") for "enforcing the provisions of this Declaration." *Id.* at 5–7.[3] Such provisions conditioned sale of the lots on certain "easements, restrictions, covenants and conditions, which are imposed for the purpose of protecting the value and desirability of, and which shall run with the land." *Id.* at 2.

Along with Lots 1 through 10, the Declaration's attached plats also depict two different sets of septic drainfields. *See generally* Plats. The "Primary Drainfield" abuts Lots 7 and 8, and the "Reserve Drainfield" and Lot 10 are separated by several hundred feet. *Id.* Relevant to these drainfields, Section 4.10 of the Declaration states:

---

[3] All page numbers referring to documents in the record refer to such documents' page numbers as provided by CM/ECF, and not necessarily to the documents' internal numbering.

The Primary and Reserve Drainfield areas as identified on the Subdivision plat shall be used solely for drainfields for the respective lots. [The Developers] reserve[] the right to grant the surface use of the area on the plat designated "Primary Drainfield Area = 1.16 ac. +/-" [sic] to the Owners of Lot 7 and Lot 8. The Owners of Lots 7 and 8 shall not interfere with the use of these sites as drainfields and shall plant no trees or shrubbery on these sites without the approval of the Lancaster County Health Department and the ACC. No driveways, playgrounds other improvements shall be constructed on these sites. The Owners of Lots 7 and 8 shall maintain the surface areas of the Primary Drainfield Area in a manner consistent with good property management. The respective Owners of the Lots served by these sites shall have the right to repair and maintain their drainfields, but the Owner effecting such repair shall return the surface of the site to the condition it was in prior to such repair. [Developers] reserve[] the right to grant the surface use of the Reserve Drainfield Area to the adjacent property owner(s) under the same conditions.

Declaration 10.  Further along, in Section 6.01, titled "Utilities and Drainage," the Declaration

states:

[The Developers] reserve[] unto itself, its successors and assigns, a perpetual easement and right of way on, over, and under that portion of each Lot, the Common Drive and the Community Area as [Developers] shall deem necessary for the establishment of drainage ways across such property and within twenty (20) feet of the right of way line of the Common Drive or boundary line of any public right of way and within seven and one-half (7 1/2) feet of any other boundary line of such Lot, Common Drive and Community area to construct, maintain, replace, and use utility lines and facilities or other public conveniences as may be necessary or desirable to serve the Subdivision, provided, however, that such rights shall not unreasonably interfere with the construction of structures. . . . These easements and rights expressly include the right to cut any trees, bushes or shrubbery or to take any other action reasonably necessary to provide economical and safe utility installation and to maintain reasonable standards of health, safety, and appearance.

*Id.* at 15.

**B. Transfers of Land**

By deed dated October 24, 2010, and recorded December 15, 2010, the Developers conveyed Lots 9 and 10, a separate 12.53-acre common area, and the "Primary Drainfield Area" to Dominion.  *See* 2010 Deed to Dominion, ECF No. 91-5.  By deed dated January 24, 2011, and recorded on February 24, 2011, Dominion then conveyed the Primary Drainfield Areas to the HOA.  *See* 2011 Deed to HOA, ECF No. 91-6.  By deed dated March 22, 2018, and recorded on

4

March 26, 2018, Dominion conveyed Lots 9 and 10 to Landfall.  *See* 2018 Deed to Landfall, ECF No. 91-7.  By Deed of Gift dated December 19, 2018, and recorded on December 28, 2018, Dominion conveyed all of its remaining interests in the Henry's Island subdivision to the HOA. *See* 2018 Deed to HOA, ECF No. 91-9.

**C. The Title Insurance Policy**

Defendant Fidelity National Title Insurance Company ("Fidelity" or "Defendant") issued an owner's policy of title insurance ("Insurance Policy" or "Policy") to Plaintiff regarding Lots 9 and 10.  *See* Insurance Policy, ECF No. 91-1.  In its "Covered Risks" section, the Insurance Policy insured, in part, against "[t]itle being vested other than as stated in Schedule A"; "[a]ny defect in or lien or encumbrance on the Title"; and "[u]nmarketable title."  *Id.* at 9.

"Title" is defined in the Insurance Policy as "[t]he estate or interest described in Schedule A."  *Id.* at 11.  "Schedule A" to the Insurance Policy stated:

1. Name of Insured:
   Landfall Trust, LLC
2. The estate or interest in the Land that is insured by this policy is:
   Fee simple
3. Title is vested in:
   Landfall Trust, LLC
4. The Land referred to in this policy is described as follows:
   **SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF[.]**

*Id.* at 2.  Exhibit A in the Insurance Policy contained the description of "the Land," as quoted below in its entirety:

> All those two certain lots or parcels of land lying and being in Bayside Magisterial District, Lancaster County, Virginia containing 2.15 acres and 2.25 acres, more or less, respectively and being more particularly shown and described on a plat of survey dated March 23, 2018 made by B.L. Stallings Land Surveying, LLC, entitled 'Plat Showing Lots 9 and 10 Henry's Island Prepared for Conveyance To Landfall Trust, LLC', a copy of which is recorded in the clerk's Office of the Circuit Court of Lancaster County, Virginia as Instrument Number 180000542.

> Further Together with a proposed 50 foot easement for ingress and egress and utilities as shown as "b" proposed 50 foot easement for ingress, egress and utilities as shown as "A" and the existing 25 foot easement recorded in Plat Book 7 at Page 21B for ingress and egress adn [sic] all other purposes beneficial to the use and enjoyment thereof, from the existing easement to Lot 9 as shown on the aforesaid plat of survey.

> Further together with a perpetual appurtenant easement of rightof [sic] way for ingress and egress and all other purposes beneficial to the use and enjoyment thereof, over and across Island Pines Drive and Windfall Lane extending to and from the property herein conveyed and Virginia State Route 698 as shown on the aforesaid plat of survey.

*Id.* at 3.  There is no mention of the Primary Drainfield Areas.  The Insurance Policy defined

"Unmarketable Title" as

> Title affected by an alleged or apparent matter that would permit a prospective purchaser or lessee of the Title or lender on the Title to be released from the obligation to purchase, lease, or lend if there is a contractual condition requiring the delivery of marketable title.

*Id.* at 11.  The Insurance Policy also contained several exceptions to coverage.  *Id.* at 4–5.  Most

relevant to this case, Exception 7 of the Insurance Policy stated that the policy

> does not insure against loss or damage . . . which arise by reason of . . . Terms, provisions, restrictions, conditions, easements, liens, assessments, developer rights, options, rights of first refusal and reservations contained in instrument recorded as [the Declaration] . . . .

*Id.* at 4.  Finally, the Insurance Policy also contained a series of Conditions.  Condition 9, titled

"Limitation of Liability," reads:

> (a) If the Company establishes the Title, or removes the alleged defect, lien or encumbrance, or cures the lack of a right of access to or from the Land, or cures the claim of Unmarketable Title, all as insured, in a reasonably diligent manner by any method, including litigation and the completion of any appeals, it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused to the Insured.
> (b) In the event of any litigation, including litigation by the Company or with the Company's consent, the Company shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals, adverse to the Title, as insured.

(c) The Company shall not be liable for loss or damage to the Insured for liability voluntarily assumed by the Insured in settling any claim or suit without the prior written consent of the Company.

*Id.* at 12.

**D. The Crotty Contract**

On November 16, 2021, Plaintiff entered into a contract to sell Lots 9 and 10 to Jesse Crotty ("Crotty Contract") for $1,550,000. *See* Crotty Contract, ECF No. 91-11. Before the Crotty Contract closed, Crotty sought a title insurance policy over the land—coincidentally also with Defendant. *See* 1st Commitment, ECF No. 91-12. Pursuant to that request, Defendant issued a formal commitment, known as a "binder," stating that:

Title to the fee simple estate or interest in the land described or referred to in this commitment is at the effective date hereof vested in:

Landfall Trust LLC as to [Lots 9 and 10] . . . .

*Id.* at 1. Subsequently, Defendant withdrew that binder and issued a second binder to Crotty ("Second Binder"), which asserted that:

Title to the fee simple estate or interest in the land described or referred to in this Commitment is at the effective date hereof vested in:

Landfall Trust LLC as to [Lots 9 and 10]
. . .
[The HOA] as to drainfield easement appurtenant to [Lot 9][.]

Second Binder 1, ECF No. 91-13. Specifically, the Second Binder added an entire paragraph describing previously unidentified easements to the "Legal Description" of the property in question:

**Further together with a perpetual appurtenant easement** for a septic force main within a 20 foot easement adjacent Windfall Lane to a 15 foot utility easement extending from Windfall Lane in an easterly direction along the southern edge of the "Primary Drainfield Area = 1.16 Ac. +/- " as shown on a plat of survey entitled "PLAT SHOWING CONSOLIDATION AND ADJUSTMENT OF BOUNDARY LINES LOTS 1 THROUGH 10 AND COMMUNITY AREA 'HENRY'S ISLAND'

SECTION ONE (FORMERLY KNOWN AS 'ISLAND PINES SECTION ONE)" prepared by Norman L. Sutton, L.S., dated October 19, 2001, last revised April 24, 2002, a copy of which is of record in the aforementioned Clerk's Office in Plat Cabinet 7, Pages 21A and 21B to drainfield for Lot 9 (formerly Lot 10) as shown on a plat of survey entitled "REVISED DRAINFIELD EASEMENT PLAT FOR 'HENRY'S ISLAND' SECTION ONE" prepared by Norman L. Sutton, L.S., dated November 6, 2002 and recorded in the aforesaid Clerk's Office in Plat Cabinet 7, Page 30A and **together with an appurtenant easement** over and across the above mentioned drainfield area for the installation, construction, operation and maintenance of a septic system drainfield.

*Id.* at 3 (emphasis added). Additionally, the Second Binder posed requirements on Crotty for Defendant to insure the land. *Id.* at 4. Specifically, Defendant asked for:

General Warranty Deed with English Covenants of Title From Landfall Trust LLC to Jesse Crotty as to Parcels 1 and 2[4]

NOTE: [The HOA] must join the above required instrument to convey the drainfield easement appurtenant to Parcel 1.

. . .

*Id.* at 4.

### E. Landfall's Claim

Following the issuance of the Second Binder, Landfall sought to resolve the differences between its Title Insurance Policy's title description and those contained in the First and Second Binders with underwriting counsel for Fidelity, but ultimately resorted to filing a claim on its Title Insurance Policy on January 7, 2022. *See* Notice of Claim, ECF No. 91-14. On January 12, 2022, counsel for Crotty, E. Duffy Myrtetus, raised questions in an e-mail about "title as it relates principally to Lot 9 and required off-site drain access." *See* ECF No. 1-7, at 23 ("Myrtetus E-mail"). On January 13, 2023, Crotty provided notice of the termination of the Crotty Contract to Landfall. Termination Notice, ECF No. 91-16. The Termination Notice reads, in relevant part:

---

[4] Parcel 1 in the Crotty Binders refers to Lot 9 in the Plats, Insurance Policy, and HOA Declaration. Similarly, Parcel 2 in the Crotty Binders refers to Lot 10 in the Plats, Insurance Policy and HOA Declaration.

"Pursuant to the provisions of the Contract, including without limitation Section 23, [Crotty] delivers this Termination Notice letter to [Landfall], regarding [Crotty]'s notice of its election to terminate the Contract."  *Id.*  Paragraph[5] 23 of the Crotty Contract made the contract contingent on Crotty verifying that (1) "Lancaster County will still allow the planned site to be built in the configuration as shown on the plat provided by Emily Cartell on 11/14/2021," and (2) "the equipment will be able to access the property as shown on the referenced plat easement."  Crotty Contract ¶ 23.

On February 1, 2022, Landfall informed Fidelity of Crotty's failure to close on the Crotty Contract.  *See* Feb. 1, 2022, Letter to Fidelity, ECF No. 91-18.  On February 23, 2022, Fidelity issued its Coverage Letter to Landfall, in which Fidelity accepted coverage as to an access easement, Easement A, but denied coverage as to Landfall's claim related to Fidelity's descriptions of the Primary Drainfield Areas and the drainage easements.  *See* Coverage Letter, ECF No. 91-20.

On February 28, 2023, Landfall and Crotty engaged in a mediation and, through an agreement ("Settlement Agreement") effective that same date, settled their dispute.  *See* Settlement Agreement, ECF No. 91-21.  In a sworn declaration, Daniel Lang, sole member and manager of Landfall, stated the following about the mediation:

> Crotty and Landfall participated in a mediation to attempt to resolve the conflicting claims over Crotty's obligation to complete the transaction. . . .
>
> I personally attended the mediation . . . . Landfall was forced to allow Crotty to withdraw from his contract because Fidelity refused to recognize Landfall's ownership of the drainfield easements . . . .

---

[5] The parties refer to the numbered provisions of the Crotty Contract differently in their briefs.  Landfall refers to the numbered provisions as "paragraphs," and Fidelity refers to them as "sections."  For the sake of clarity, the Court will primarily refer to them as "Paragraphs," except that the Court will use "Section" when a direct quote does the same.

9

Decl. Daniel Lang ¶ 5, ECF No. 24-1.  Crotty and Landfall's Settlement Agreement included a

portion that discussed the reasons for the Crotty Contract's failure, which reads:

> WHEREAS, certain disputes have arisen regarding the Purchase Agreement between [Crotty] and [Landfall], in connection with claims that, among other things, question [sic] regarding the title to Property;
>
> WHEREAS, [Crotty] identified certain objections to the title to the Property within the meaning of Paragraph 15 of the Purchase Agreement . . . .

Settlement Agreement 2.  Paragraph 15 of the Purchase Agreement (the Crotty Contract) required

Landfall to convey proper title and allowed Crotty to terminate the contract in the event of an

uncured title defect.[6]

On March 10, 2022, Landfall requested that Fidelity reconsider its coverage denial.  *See*

LF Letter, ECF No. 91-22.   Having received no response, on April 10, 2022, Landfall commenced

the instant litigation against Fidelity.  *See* Compl., ECF No. 1.  On April 28, 2022, Fidelity issued

a response denying Landfall's request for reconsideration.   Reconsideration Letter, ECF No. 91-

23.  On July 22, 2022, Fidelity issued a $90,000.00 payment to Landfall based on its earlier partial

acceptance of coverage related to Easement A.  Loss Determination, ECF No. 91-24.

**F. Rule 19 Litigation**

After this case had progressed for some time, on February 14, 2023, Defendant filed a

---

[6] Paragraph 15 of the Crotty Contract reads, in pertinent part:

> **TITLE**: At settlement [Landfall] shall convey the Property to [Crotty] by general warranty deed containing English covenants of title (except that conveyance from a personal representative of an estate or from a trustee or institutional lender shall be by special warranty deed), free from all encumbrances, tenancies, and liens (for taxes and otherwise), but subject to such restrictive covenants and utility easements of record which do not materially and adversely affect the use of the Property for [Crotty]'s intended purposes or render the title unmarketable. . . . If the examination reveals a title defect of a character that can be remedied by legal action or otherwise within a reasonable time, then [Landfall], at [Landfall]'s expense, shall promptly take such action as is necessary to cure such defect.  If the defect is not cured within 60 days after [Landfall] receives notice of the defect, then [Crotty] shall have the right to (i) terminate this Contract . . . and [Crotty] and [Landfall] shall have no further obligations hereunder, or (ii) waive the defect and proceed to settlement with no adjustment to the Purchase Price.

Crotty Contract ¶ 15.

Motion to Dismiss for Lack of Jurisdiction and Failure to Join Indispensable Party Pursuant to Fed. R. Civ. P. 19 ("Rule 19 Motion to Dismiss"). ECF No. 72. The Rule 19 Motion to Dismiss was predicated on Plaintiff's arguments seeking the Court to resolve questions of ownership of the actual drainfield areas and challenging the validity of the deeds transferring the drainfield areas to the HOA. Fidelity argued that the HOA needed to be joined to the litigation as a necessary and indispensable party because such arguments implicated the HOA's rights and interests, necessitating their joinder. *See* Def.'s Mem. Supp. Rule 19 Mot. 2, ECF No. 74. Such joinder would, however, divest the Court of subject matter jurisdiction over the suit due to the lack of diversity of citizenship between the HOA and Landfall.

On May 11, 2023, the Court issued a Memorandum Opinion denying Fidelity's Rule 19 Motion ("Rule 19 Opinion"), explicitly stating:

> Plaintiff's breach of contract suit does not necessitate the joinder of the HOA, as ascertaining the ownership of the drainfield areas is not a necessary pre-requisite before the Court can turn to the merits of the breach of contract claim. In other words, Plaintiff is potentially capable of succeeding on the merits of its breach of contract suit based on the various insurance documents and title binders before the Court, without delving into the actual ownership of the drainfield areas.

Rule 19 Opinion, ECF No. 115. In essence, the Rule 19 Opinion directed Plaintiff to refocus its efforts on pursuing and proving the allegations in the Complaint—that is, arguments based on the Insurance Policy and Title Binders—rather than disputing the ownership of the drainfields.

**G. Cross-Motions for Summary Judgment**

After the parties filed their Rule 19 briefs, the parties each filed Motions for Summary Judgment. Def.'s Mot. Summ. J., ECF No. 90; Pl's Second Mot. Partial Summ. J.,[7] ECF No. 97. On June 7, 2023, the Court heard oral argument on these cross-motions, with particular focus on

---

[7] As the name suggests, this was Plaintiff's second motion for partial summary judgment. Plaintiff filed its first motion for partial summary judgment on September 9, 2022. *See* Pl's Mot. Partial Summ. J., ECF No. 18. The Court denied that motion in full on March 13, 2023. *See* Mem. Op., ECF No. 88.

the question of whether the Rule 19 Opinion rendered moot certain of the parties' arguments for summary judgment.

On June 13, 2023, the Court issued a Memorandum Opinion ("June 13 Cross-Motions Opinion") in which the Court denied Plaintiff's motion and granted in part and denied in part Defendant's motion. *See* June 13 Cross-Motions Opinion, ECF No. 132. The issue as to which the Court partially granted Defendant's motion was the application of the Insurance Policy's Exception 7, which excepts from coverage matters directly based on the HOA Declaration. *See id.* at 13–14. The Court ruled that "Exception 7 bars Plaintiff from relying on the provisions of the Declaration as a manner of alleging a breach of the Insurance Policy." *Id.* at 14. The Court only granted Defendant's motion in part, though, because the Court did not agree with Defendant that Plaintiff's entire breach of contract claim was based on the HOA declaration. *Id.* at 13–14. The Court explained that "[w]hile Plaintiff may no longer rely on the terms of the Declaration to ground its breach of contract claim against Defendant, Plaintiff may still pursue other avenues of breach that do not involve allegations of loss arising from the terms of the Declaration." *Id.* at 14.

In that Opinion, the Court also rejected Fidelity's argument that Condition 9(c) precludes Plaintiff's claims. *Id.* at 14–16. Essentially, Fidelity argued that Plaintiff could not recover based on how Plaintiff gave notice to Fidelity about its dispute with Crotty and how Plaintiff settled its dispute with Crotty. *Id.* The Court found that argument unavailing,[8] meaning that Plaintiff may rely on facts surrounding its settlement with Crotty in proving its claims. *See id.*

**H. Rebriefing Order and Renewed Cross-Motions for Summary Judgment**

Following the June 7 motion hearing and the Court's issuance of the June 13 Cross-

---

[8] Despite the Court already ruling against it on this issue, "Fidelity maintains its position that Landfall failed to provide adequate written notice of its intention to settle its claims against Crotty and did not obtain permission from Fidelity to do so." Def.'s Resp. 2 n.4. But the Court's June 13 Cross-Motions Opinion ruling is now the law of the case. As such, the Court will not re-address this rejected argument.

Motions Opinion, the Court issued an order ("Rebriefing Order") directing the parties to re-brief

the question of Defendant's liability in light of its rulings.  Rebriefing Order 1–2, ECF No. 134.

Specifically, the Court ordered the parties to

> directly address whether Fidelity breached the terms and provisions of the
> Insurance Policy, specifically with respect to the three theories of breach asserted
> by Plaintiff in the Complaint. . . . In the Complaint, Plaintiff posited three avenues
> whereby Defendant allegedly breached the Insurance Policy: not paying insurance
> proceeds to Plaintiff for either (1) "Title being vested other than as stated in
> Schedule A"; (2) "Any defect in or lien or encumbrance on the Title"; or (3)
> "Unmarketable title."  The re-briefing should focus on these three avenues of
> breach and why they have or have not come to fruition with the facts of this case
> given the principles of contract law. The Parties should specifically address the
> implications of the Court's Rule 19 Opinion as it relates to any of these three
> theories.

*Id.*  The Court further directed the parties to "specifically address their disputed interpretation of

'Unmarketable Title,' as it is defined within the Insurance Policy."  *Id.* at 2.

The Court also ordered, in line with its Rule 19 Opinion and directive from the bench at

the motion hearing, that the parties not attempt to litigate the ownership of the drainfields.  *Id.*

The parties filed their memoranda in support of the respective renewed cross-motions on

June 27, 2023.  Pl's Mem. Supp., ECF No. 136; Def.'s Mem. Supp., ECF No. 137.  Plaintiff

responded in opposition to Fidelity's renewed motion on July 2, 2023.  Pl's Resp.,  ECF No. 139.

Fidelity filed its memorandum in opposition of Plaintiff's renewed motion on July 11, 2023.  Def.'s

Resp., ECF No. 140.  Both parties filed replies on July 17, 2023.  Pl's Reply, ECF No. 142; Def.'s

Reply, ECF No. 141.

## II. STANDARD OF REVIEW

The standard of review for cross-motions for summary judgment is well-settled in the

Fourth Circuit.

> On cross-motions for summary judgment, a district court should "rule upon each
> party's motion separately and determine whether summary judgment is appropriate

as to each under the [Federal Rule of Civil Procedure] 56 standard." *Monumental Paving & Excavating, Inc. v. Pa. Mfrs.' Ass'n Ins. Co.*, 176 F.3d 794, 797 (4th Cir. 1999). Summary judgment is appropriate only if the record shows "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(c).

*Norfolk S. Ry. Co. v. City of Alexandria*, 608 F.3d 150, 156 (4th Cir. 2010) (alteration in original).

The relevant inquiry in the summary judgment analysis is "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247–48. A material fact is one that might affect the outcome of a party's case. *Id*. at 248; *JKC Holding Co. LLC v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). A "genuine" issue concerning a "material" fact only arises when the evidence, viewed in the light most favorable to the nonmoving party, is sufficient to allow a reasonable trier of fact to return a verdict in that party's favor. *Id*.

Furthermore, to defeat an otherwise properly supported motion for summary judgment, the nonmoving party must rely on more than conclusory allegations, "mere speculation or the building of one inference upon another," or the "mere existence of a scintilla of evidence" concerning a material fact. *Stone v. Liberty Mut. Ins. Co.*, 105 F.3d 188, 191 (4th Cir. 1997) (citations omitted); *Anderson*, 477 U.S. at 252. Accordingly, to deny a motion for summary judgment, "[t]he disputed facts must be material to an issue necessary for the proper resolution of the case, and the quality

14

and quantity of the evidence offered to create a question of fact must be adequate." *Thompson Everett, Inc. v. Nat'l Cable Adver., LP*, 57 F.3d 1317, 1323 (4th Cir. 1995). "Thus, if the evidence is merely colorable or not significantly probative, it may not be adequate to oppose entry of summary judgment." *Id*. (quotation marks and citation omitted).

### III. DISCUSSION

The overarching issue to be decided by this Court is whether Plaintiff has established as matter of law that Defendant caused the occurrence of one of the three "Covered Risks" in the Insurance Policy that Plaintiff raises in its Complaint:  (1) "Title being vested other than as stated in Schedule A"; (2) "Any defect in or lien or encumbrance on the Title"; or (3) "Unmarketable title."  *See* Compl. ¶ 35, ECF No. 1 (quoting Insurance Policy 9, ECF No. 91-1).

Plaintiff, pointing to Defendant's issuance of the Second Binder, moves for summary judgment on the basis that it has shown that one of the "Covered Risks" occurred.  *See* Compl. ¶¶ 13–15, 35, 37–39; Pl's Mem. Supp. 3–7, ECF No. 136; Pl's Resp. 1–5, ECF No. 139; Pl's Reply 1–3, 6–7, ECF No. 142.  Plaintiff thus argues that it is entitled to summary judgment because Defendant is liable for breach as a matter of law due to its failure to either pay out or take steps to remedy a defect caused by one of the three "Covered Risks."  *See, e.g.*, Compl. ¶ 40; Pl's Mem. Supp. 3–7.

Inversely, Fidelity moves for summary judgment on the basis that it is not liable for breach, forwarding two arguments: (1) as a threshold matter of law, Exception 7 to the Insurance Policy precludes Plaintiff's arguments as to the three "Covered Risks," *see* Def.'s Mem. Supp. 8–12, ECF No. 137; Def.'s Resp. 8–10, ECF No. 140; and (2) even if Plaintiff's arguments are not based on the Declaration and thus not precluded by Exception 7, none of the three "Covered Risks" came to fruition, *see* Def.'s Mem. Supp. 13–19; Def.'s Resp. 11–16.

The parties represent that there are no genuine disputes of material fact and that the question of liability can be decided by the Court.  *See* Hr'g Tr. 6:3–4, 7:10, ECF No. 135.  Upon reviewing the record and the parties' arguments itself, the Court concurs.

After viewing the facts in the light most favorable to the non-movant as to each respective argument, the Court finds the following as a matter of law:  (1) Exception 7 of the Policy precludes Plaintiff's claims that Fidelity is liable for breach of the Policy under the first two Covered Risks, but not under the third, "Unmarketable title" Covered Risk; and (2) Plaintiff has established that Fidelity is liable for breach of the Policy because Fidelity's issuance Second Binder gave rise to "Unmarketable title" as defined in the Policy, and Fidelity never paid out on the Policy or cured the problem.  Accordingly, Plaintiff is entitled to summary judgment on the issue of liability, and Fidelity is not.

## A.  Covered Risk 1: Title Being Vested Other than as Stated in Schedule A

To prevail on the basis of Covered Risk 1, Plaintiff must prove that Fidelity somehow made it such that "Title [is] vested other than as stated in Schedule A" in the Insurance Policy.  Insurance Policy 9.  The Policy defines "Title" as "[t]he estate or interest described in Schedule A."  *Id.* at 11.  The estate or interest described in Schedule A is a "Fee simple" vested in "Landfall Trust, LLC" as to "Lots 9 and 10."  *Id.* at 2.  So, the question is whether Plaintiff has established that the estate or interest in Lots 9 and 10 is something other than a fee simple estate vested in Landfall Trust.  However, before reaching that question, the Court finds that Plaintiff's theory of recovery is precluded by Exception 7 to the Insurance Policy.

In the insurance context, while "the policyholder bears the burden of proving that the policyholder's conduct is covered by the policy," *Res. Bankshares Corp. v. St. Paul Mercury Ins. Co.*, 407 F.3d 631, 636 (4th Cir. 2005) (citations omitted), "the insurer bears the burden of proving that an exclusion applies," *Elegant Massage, LLC v. State Farm Mut. Auto. Ins. Co.*, 506 F. Supp.

3d 360, 369 (E.D. Va. 2020) (quoting *Bohreer v. Erie Ins. Group*, 475 F.Supp.2d 578, 585 (E.D. Va. 2007) (internal citations omitted)).  Therefore, because Fidelity relies upon the exclusionary language in Exception 7 as a defense, "the burden is upon [Fidelity] to prove that the exclusion applies to the facts of the case." *Bituminous Cas. Corp. v. Sheets*, 389 S.E.2d 696, 698 (Va. 1990); *see also Am. Reliance Ins. Co. v. Mitchell*, 385 S.E.2d 583 (Va. 1989) ("Exclusionary language in an insurance policy will be construed most strongly against the insurer and the burden is upon the insurer to prove that an exclusion applies.").  Specifically, Fidelity's burden is to prove that Plaintiff's arguments "rely on the terms of the [HOA] Declaration to ground its breach of contract claim."  June 13 Cross-Motions Opinion 14, ECF No. 132; *see also TFWS, Inc. v. Franchot*, 572 F.3d 186, 191 (4th Cir. 2009) ("The law of the case doctrine 'posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'").

Fidelity argues that Plaintiff solely bases its argument for this theory of breach on interests derived from the HOA Declaration.  *See* Def.'s Mem. Supp. 12.  Plaintiff argues that this assertion is wrong.  *See, e.g.*, Pl's Resp. 3.

Plaintiff's argument for why title is vested other than as stated in Schedule A of the Policy is that "the legal descriptions" of the land in the 2018 Policy and the 2021 Second Binder "are different."  Pl's Reply 1–2; *see also, e.g.*, Compl. ¶ 37.  As Plaintiff points out in his Complaint, the Policy states that "Title [to Lots 9 and 10] is vested in: Landfall Trust, LLC" in "Fee simple," but the Second Binder states that "Title to the fee simple estate or interest in the land . . . is . . . vested in: Landfall Trust LLC as to [Lots 9 and 10] [and] . . . [the HOA] as to drainfield easement appurtenant to [Lot 9][.]"  Compl. ¶¶ 9, 14; *see* Pl's Mem. Supp. 5–6.  *Compare* Insurance Policy 2, ECF No. 91-1, *with* Second Binder 1, ECF No. 91-13.  And Plaintiff accurately notes that the

17

Insurance Policy gives a legal description of the land, but the Second Binders adds (while keeping everything else the same) a paragraph that includes the relevant "appurtenant easement." *See* Pl's Reply 2. *Compare* Insurance Policy 3, *with* Second Binder 3. Plaintiff asserts that "[t]he 2018 policy states that title is vested in Landfall only," but the 2021 Second Binder "state[s] that the land is vested in both Landfall and in the homeowners' association." Compl. ¶ 37. Plaintiff argues that the differing legal description in the Second Binder proves that, as a matter of law, "title is vested other than as stated in Schedule A of the 2018 Policy." *Id.*

Because the only difference between the Insurance Policy's and the Second Binder's descriptions of how the interests in the property are vested in the property is the HOA's appurtenant easement (and because that is the only difference Plaintiff references in his Complaint), that must be the difference on which Plaintiff's argument on this theory of liability relies. *See* Compl. ¶¶ 9, 14; *see also* Pl's Reply 1–2.

As the Court interprets Covered Risk 1, Plaintiff cannot simply point to the fact that "the words are [not] the same" in the Policy and the Second Binder and win. Pl's Reply 1–2. Rather, Plaintiff must show that title is, as a factual matter, vested differently. So, for Plaintiff to be correct that the HOA's easement makes it such that "Title" is in fact "vested other than as Stated in Schedule A" of the Insurance Policy, it matters whether the drainage easement in fact exists. And for Plaintiff to be correct that "the land is vested in both Landfall and in the homeowners' association," Compl. ¶ 37, it matters that the easement is in fact vested in the HOA.

Plaintiff has never directly refuted Fidelity's contention (from the last round of summary judgment motions) that the drainage easement in question in fact comes from Section 6.01 of the HOA Declaration. *See* Def.'s 1st Mem. Supp. 2–3, ECF No. 92 (citing Aff. Ray Aaronian ¶¶ 14–18, ECF No. 91). Plaintiff's nearest response came before the Rebriefing Order, where Plaintiff

asserted that Section 6.01 "has nothing to do with the rights in the drainfields at issue." Pl's Mem. Opp. 4, ECF No. 102.  Even setting aside the fact that Plaintiff cited to no evidence from the record to support this, Plaintiff's assertion is ultimately nonresponsive to Fidelity's, because under the HOA Declaration, the rights in the drainfields are distinct from rights in any drainage *easements*. *Compare* Declaration 10, ECF No. 91-4 (Section 4.01), *with id.* at 15 (Section 6.01).  None of Plaintiff's post-Rebriefing Order briefs squarely confronted Fidelity's assertion on this point, let alone pointed the Court to any evidence to the contrary. *See generally* Pl's Mem. Supp; Pl's Resp.; Pl's Reply.

Instead of factually disputing Fidelity's contention, Plaintiff has attempted to reinvent its argument on this theory and couch it in a different document: "Plat Cabinet #7." *See* Pl's Mem. Supp. 4 (citing "Plat Cabinet #7 Page 21 A & B").  But this runs counter to Plaintiff's Complaint, which based the existence of the title rights pertinent to this lawsuit entirely on the HOA Declaration. *See* Compl. ¶¶ 7–8; *see also* Pl's Mem. Opp. 2 ("Landfall's rights are established by the HOA documents (the Covenants)[.]").  "[P]laintiff may not amend [its] complaint through argument in a brief opposing [or supporting] summary judgment." *Barclay White Skanska, Inc. v. Battelle Mem'l Inst.*, 262 F. App'x 556, 563 (4th Cir. 2008).  Based on how Plaintiff drafted its Complaint, the Court concludes that Plaintiff's arguments on this theory rest on the HOA Declaration.[9]

Because the Court finds that Plaintiff relies on the HOA Declaration on this theory of

---

[9] Even if the Court allowed Plaintiff to shift its reliance at this late stage to pages 21A and 21B of Plat Cabinet 7, Plaintiff's argument would fail because it is barred by Exception 8 of the Insurance Policy.

Exception 8 provides that the Policy "does not insure against loss or damage . . . which arise by reason of . . . Subject matters shown on plat of survey recorded in Plat Cabinet 7, pages 21A and 21B, including but not limited to: . . . location of offsite reserve drainfield easements." Insurance Policy 4.  The contractual terms are clear and unambiguous:  Plaintiff cannot rely on these pages of Plat Cabinet 7 to establish Fidelity's breach of the policy under this (or any) theory.  Fidelity has comfortably met its burden to show that Plaintiff's reliance on Plat Cabinet 7 is barred as a matter of law, and thus any such arguments by Plaintiff necessarily fail.

liability, the Court must conclude that Exception 7 precludes Plaintiff's arguments on this theory.
*See* June 13 Cross-Motions Opinion 14; Rebriefing Order 2; *see also Franchot*, 572 F.3d at 191
("[W]hen a court decides upon a rule of law, that decision should continue to govern the same
issues in subsequent stages in the same case." (internal quotation marks omitted)).  Accordingly,
the Court finds for Defendant and against Plaintiff on this issue and holds that Exclusion 7 bars
Plaintiff's pursuit of this theory as a matter of law, and Plaintiff thus cannot recover based on
Covered Risk 1.[10]

**B. Covered Risk 2: Any Defect in or Lien or Encumbrance on the Title**

To recover under Covered Risk 2, Plaintiff must establish that Fidelity issuance of the
Second Binder revealed "[a]ny defect in or lien or encumbrance on the Title" insured in the
Insurance Policy.  Unfortunately for Plaintiff, however, recovery is once again barred by Exception
7, as the purportedly established defects all arise from the HOA Declaration.

Again, as the moving party on this issue and the issuer of the Insurance Policy, Fidelity
bears the burden to prove that Plaintiff's arguments necessarily "rely[] on the provisions of the

---

[10] The Court in its Rebriefing Order allowed Plaintiff an opportunity to provide an interpretation (which
Plaintiff's counsel suggested existed at the June 7 motion hearing) that the Insurance Policy covered the Drainfield
Areas.  *See* Rebriefing Order 2.  Plaintiff has appeared to fold its arguments on this point into its arguments as to
"Covered Risk" 1.  *See* Pl's Reply 2–3.  No matter where Plaintiff's arguments properly go organizationally, Plaintiff's
attempts to show that the Drainfield Areas are within the insured, 2018 property description fail as a matter of law.

Plaintiff's primary argument in its renewed motion for why the Drainfield Areas (or at least, those abutting
Lots 9 and 10) are insured relies on pages 21A and 21B of Plat Cabinet 7.  *See* Pl's Mem. Supp. 4.  That argument
must fail because Fidelity has met its burden to show that Exception 8 of the Policy precludes any arguments Plaintiff
might make based on those pages of that plat.  *See* Insurance Policy 4 ("This policy . . . does not insure against loss or
damage . . . which arise by reason of . . . Subject matters shown on plat of survey recorded in Plat Cabinet 7, pages
21A and 21B . . . ."); discussion *supra* n.9.

The Court construes Plaintiff's other, related arguments for why the Drainfield Areas are insured under the
Policy as impermissible arguments as to ownership to the Drainfield Areas.  In its Reply, Plaintiff contends (without
making any record citations) that "the 2002 plat recorded before the HOA documents" shows that "Landfall is entitled
to all rights to Lot 9" which includes "a drain field."  Pl's Reply 2–3.  As a threshold matter, the Court understands
"the 2002 plat" to be Plat Cabinet 7, so Plaintiff's argument would again be barred by Exception 8.  In any event, the
Court has ruled that Plaintiff cannot litigate about the ownership and interests in the Drainfield Areas without
implicating the HOA's interests and necessitating joinder and remand to state court, *see, e.g.*, June 13 Cross-Motions
Opinion 8; Rebriefing Order 2, so, Plaintiff cannot make any argument about any purported "rights" or interest that it
has in any of the drain fields.

[HOA] Declaration as a manner of alleging a breach of the Insurance Policy" under this theory, which "Exception 7 clearly prohibits" as a matter of law. June 13 Cross-Motions Opinion 14; *see also, e.g.*, *Elegant Massage*, 506 F. Supp. 3d at 369 ("[T]he insurer bears the burden of proving that an exclusion applies."); *Bituminous Cas. Corp.*, 389 S.E.2d at 698 ("[T]he burden is upon the insurer to prove that the exclusion applies to the facts of the case.").

As it did on the first theory, Fidelity argues that Plaintiff bases this theory of liability on the HOA Declaration. *See* Def.'s Mem. Supp. 12. Plaintiff again resists this assertion. *See, e.g.*, Pl's Resp. 3.

Admittedly, Plaintiff's arguments on this theory have varied over the course of this litigation, but the Court lays out the strongest version here.[11] In its Complaint, Plaintiff argued that there was "a defect in or encumbrance on the title" because "Fidelity had 'written out' the ownership of the drain fields from the legal description in the 2018 Policy." Compl. ¶ 38. The Court subsequently held that the parties could not litigate the actual ownership of the drainfields in this lawsuit. So, as Plaintiff's argument currently stands, Plaintiff is arguing that because "the title described in the 2021 [Second Binder] is different, . . . when compared with 2018 policy description, [the description is] materially deficient" and thus there is a "title defect." Pl's Reply 1–2. Again, the sole difference in the descriptions between Second Binder and Insurance Policy that Plaintiff's Complaint references is the HOA drainfield easement, so this must be the "title defect" Plaintiff is relying on.

---

[11] The Court adds that in its first memorandum after the Rebriefing Order, Plaintiff titled a section "Defect in or Lien or Encumbrance on Title," but then spent none of that section explaining why the differing legal description in the Second Binder (or anything else, for that matter) established a defect in title. *See* Pl's Mem. Supp. 6–7. Instead, Plaintiff simply asserted that the HOA's drainage easement was a defect and argued that Fidelity was obligated to disclose the easement. *See id.* Of course, Plaintiff must *prove* that there was a defect to succeed on this theory of liability; Plaintiff cannot just assert, without support, that something constitutes a defect. And any argument that Fidelity was obligated to disclose a defect is nonresponsive to the ultimate question of liability on this theory of whether there is a defect in title caused by Fidelity.

As the Court interprets Covered Risk 2, Plaintiff's arguments are precluded by Exception 7 for the same reason its arguments as to Covered Risk 1 were. To succeed on its breach claim, Plaintiff must show that the alleged defect (or lien or encumbrance) on its fee simple in Lots 9 and 10 exists as a factual matter. Because the only alleged defect on which Plaintiff has ever based this theory is the HOA's drainage easement, Plaintiff must establish the factual existence of the HOA's easement to prevail. But as this Court has just explained, any argument that relies on the existence of the HOA's easement relies the HOA Declaration. *See* discussion *supra* Part III.A.1. And because "Exception 7 bars Plaintiff from relying on the provisions of the [HOA] Declaration as a manner of alleging a breach of the Insurance Policy," June 13 Cross-Motions Opinion 14, Plaintiff's arguments on this theory of liability are barred as a matter of law (even when the Court views the facts in the light most favorable to Plaintiff).

Accordingly, the Court again rules for Fidelity and against Plaintiff as a matter of law as to this theory of liability.

**C. Covered Risk 3: Unmarketable Title**

Plaintiff's final avenue for recovery, Covered Risk 3, requires Plaintiff to establish that Fidelity's issuance of the Second Binder caused the occurrence of the "Unmarketable title" Covered Risk as defined in the Insurance Policy. The Insurance Policy defines "Unmarketable Title" as

> Title affected by an alleged or apparent matter that would permit a prospective purchaser or lessee of the Title or lender on the Title to be released from the obligation to purchase, lease, or lend if there is a contractual condition requiring the delivery of marketable title.

Insurance Policy 11. "[T]he title insurance policy definition of unmarketable title still depends on each jurisdiction's legal doctrine of unmarketable title, since that will determine whether the existence of a particular title defect would entitle a potential purchaser to be released from a

22

contract to purchase." Joyce Palomar, 1 Title Ins. Law § 5:7 (2023 ed.). Under Virginia law, marketable title is title

> which is free from liens or encumbrances; one which discloses no serious defects and is dependent for its validity upon no doubtful questions of law or fact; one which will not expose the purchaser to the hazard of litigation or embarrass him in the peaceable enjoyment of the land; one which a reasonably well-informed and prudent person, acting upon business principles and with full knowledge of the facts and their legal significance, would be willing to accept, with the assurance that he, in turn, could sell or mortgage the property at its fair value.

*Denton v. Browntown Valley Assocs., Inc.*, 803 S.E.2d 490, 495 (Va. 2017); *see also* Palomar, 1 Title Ins. Law § 5:7 ("Traditional land title legal doctrine holds that marketable title is a title legally free from doubt and free from the threat of potential litigation."); 1 Patton and Palomar on Land Titles § 48 (3d ed.) ("[T]he term 'unmarketable title' includes both 'bad titles' and 'doubtful titles.'").

Hence, the question, to determine whether Plaintiff is entitled to summary judgment on this theory of liability, is: has Plaintiff established that Fidelity's issuance of the Second Binder created an "alleged or apparent matter" that caused Crotty to believe that there was "doubt[]" or "questions of law or fact" as to the validity of Landfall's title? After reviewing the record and the parties' arguments, the Court answers that question in the affirmative.

1. <u>Applicability of Exception 7</u>

Yet again, the threshold issue is whether Plaintiff's argument relies on the HOA declaration. Fidelity argues that it does, *see* Def.'s Mem. Supp. 12, and Plaintiff argues that it does not, *see, e.g.*, Pl's Resp. 3.

Like Plaintiff's first two theories, Plaintiff's "Unmarketable title" theory relies on the Second Binder's mention of the HOA easement.[12] *See* Compl. ¶¶ 9, 14; *see also* Pl's Mem. Supp.

---

[12] Fidelity argues that Plaintiff "conceded that drainage easements are not at issue" at the June 7 motion hearing and thus Plaintiff cannot make any legal arguments that relate to the Second Binder's inclusion of the HOA

5–6; Pl's Reply 1–2. But unlike Plaintiff's first two theories, this theory does not rely on the factual existence of the HOA easement itself. This theory relies only on Defendant's actions vis-à-vis describing Plaintiff's title, and those actions' impact on Crotty's subjective reasons for not closing.

As the Policy defines the term "Unmarketable title," it does not matter whether the HOA's drainage easement factually exists and is or is not factually vested in the HOA. Instead, under the

---

easement to establish Fidelity's alleged breach of the Policy. Def.'s Mem. Supp. 11 n.11; *see also* Hr'g Tr. 15:3–18:5.

> Fidelity's argument stems from the following exchange from the June 7 motion hearing:
>
> THE COURT: What I want to know is where is the easement that runs to the drain field? . . . Is there anything that runs from those plats to those drain fields?
> MR. ROBBINS: I am not sure. I don't think I understand your question, Your Honor.
> THE COURT: So isn't part of this litigation about easements that run from the -- that allow a right-of-way to go from the plots of land that carry waste water maybe to the drainfields?
> MR. ROBBINS: No, Your Honor, it does not. In deeds interest in the land [sic]. If you look at section the 4.10 of the covenants and restrictions, are to be used -- they are to be used solely -- here we go. On document 94-1, page 1080 it says, this is paragraph 4.10 of the covenants and declarations. "The primary and reserved drain fields as identified in the subdivision plat shall be used solely for drain fields for the respective lots. The respective owners of the lots served by these sites shall have the right to repair and maintain their drain field." So the drain fields accompany the lots whenever they are transferred.

*Id.* 15:3–16:11.

Counsel for Plaintiff's answer in the negative that Fidelity homes in on does not make sense grammatically as being an answer to the Court's question about whether easements are at issue in this case. *See id.* 15:20–24 ("THE COURT: . . . isn't part of this litigation about the easements . . . ? MR. ROBBINS: No, Your Honor, it does not."). Rather, it makes more sense if Plaintiff's counsel was answering "no" to the Court's question about what the easement at issue in this case "does." *See id.* ("THE COURT: . . . [Doe]sn't . . . the easement[] . . . allow a right-of-way to go from the plots of land that carry waste water maybe to the drainfields? MR. ROBBINS: No, Your Honor, it does not."). Additionally, right before this exchange, Plaintiff's counsel admitted that he was not understanding the Court's questioning. *See id.* 15:18–19. Based on its review of the hearing transcript, the Court cannot agree with Fidelity that Plaintiff's counsel intentionally sought to give up any argument based on the HOA easement at the motion hearing.

Furthermore, Plaintiff has continued to make arguments based on the Second Binder's inclusion of the HOA drainage easement in each of its post-Rebriefing Order filings. *See* Pl's Mem. Supp. 5–6; Pl's Resp. 1; Pl's Reply 1–2, 6. As Plaintiff puts it, Landfall "has argued repeatedly that its claim is based on the description of the title as drafted by Fidelity." Pl's Reply 6. In other words, Plaintiff recognizes that its whole case is premised on the Second Binder's inclusion of the HOA's easement. *See* discussion *supra* Part III.A.1. So, nothing about Plaintiff's conduct after the motion hearing supports Fidelity's contention that Plaintiff intended to drop the easement issue.

In any event, even when a party appears to relinquish an argument or disregard an issue, the decision of whether to deem the argument or issue as conceded is one squarely within the Court's discretion. *See, e.g.*, *Baka v. City of Norfolk, Virginia*, No. 2:21cv419, 2022 WL 757218, at *7 n.2 (E.D. Va. Mar. 11, 2022). So, even assuming that Plaintiff's conduct has given the Court "the discretion to treat those arguments as conceded[,] . . . the Court declines to exercise such discretion here." *Id.*

Policy's terms, it only matters that the Second Binder's inclusion of the HOA's easement raised "alleged or apparent" questions about the validity of title in the eyes of Crotty that caused Crotty to back out of purchasing Lots 9 and 10 from Plaintiff.  Insurance Policy 11; *see Denton*, 803 S.E.2d at 495; *see also* Palomar, 1 Title Ins. Law § 5:7.  In its briefs, Fidelity appears to acknowledge that an "*alleged* question concerning marketability of title" or an "*alleged* title issue" or "problem" would be sufficient to trigger the occurrence of the "Unmarketable title" Covered Risk under the Policy's terms.  *See* Def.'s Reply 11–12 ("Unmarketable Title is not a legitimate issue in this dispute because Landfall's proposed purchaser (Crotty) based his termination of the Purchase Agreement on local zoning issues and not any *alleged* question concerning marketability of title." (emphasis in original)); Def.'s Mem. Supp. 18 ("Crotty did not terminate the Purchase Agreement based on any *alleged* title issue (under Paragraph 15 of the agreement)." (emphasis added)); Def.'s Resp. 15 (same); Def.'s Reply 3 ("[Plaintiff's] proposed purchaser (Crotty) terminated the purchase agreement because of local zoning issues and not because of any *alleged* title problem." (emphasis added)).

As the Court interprets the Insurance Policy, Plaintiff's "Unmarketable title" theory relies, at most, on the Second Binder's *assertion* that the HOA easement exists; it does not rely on the *factual existence* of the HOA's easement.  *See* Pl's Reply 6 (explaining that "its claim is based on the description of the title as drafted by Fidelity," as contrasted to the factual vesting of title and other interests).  Thus, this theory does not "rely on the [HOA] Declaration," and Exception 7 does not preclude Plaintiff's arguments here.  *See* June 13 Cross-Motions Opinion 14.  Regardless of whether the Court views the facts in the light most favorable to Fidelity or to Plaintiff, the Court must rule against Fidelity and for Plaintiff as to Exception 7's application to this theory as matter of law.  The Court thus proceeds to the merits of Plaintiff's claim for breach.

2. <u>Merits of Plaintiff's Breach Claim</u>

On the merits of Plaintiff's "Unmarketable title" claim, the dispositive factual issue is whether Crotty backed out of the purchase due to "alleged or apparent" factual or legal doubt or questions as to the validity of the title that he was attempting to purchase.  Insurance Policy 11; *see Denton*, 803 S.E.2d at 495 (defining marketable title as title that "is dependent for its validity upon no doubtful questions of law or fact"); *see also* Palomar, 1 Title Ins. Law § 5:7 ("[M]arketable title is a title legally free from doubt[.]"); 1 Patton and Palomar on Land Titles § 48 ("[T]he term 'unmarketable title' includes . . . 'doubtful titles.'").

Even viewing the facts in the light most favorable to Fidelity, the undisputed evidence in this case reveals two, non-mutually exclusive explanations provided by Crotty to explain his refusal to close.  One stems from questions related to zoning.  The other explanation, which ultimately entitles Plaintiff to summary judgment, is doubts related to title.  Viewing the facts in the light most favorable to Plaintiff, of course, only strengthens this result.

Plaintiff's evidence shows that Crotty backed out, at least in part, because of alleged or apparent questions regarding the title he would be receiving to Lots 9 and 10.  Plaintiff's first piece of evidence is an e-mail from Crotty's attorney, who, after Fidelity issued the Second Binder revealing the HOA easement, raised questions about issues relating to the transaction, "including title as it relates principally to Lot 9 and required off-site drain access."  Myrtetus E-mail, ECF No. 1-7, at 23; *see also* Pl.'s Reply 6 (quoting Myrtetus E-mail).  Plaintiff's second piece of evidence is a sworn declaration from Daniel Lang, the sole member and manager of Landfall.  *See* Decl. Daniel Lang, ECF No. 24-1; *see also, e.g.*, Pl's Reply 7 (citing Decl. Daniel Lang).  Lang testified that he was present at the mediation between Crotty and Plaintiff and that "[Plaintiff] was forced to allow Crotty to withdraw from his contract because Fidelity refused to recognize

[Plaintiff]'s ownership of the [HOA] drainfield easements[.]"  Decl. Daniel Lang ¶ 5; *see also, e.g.*, Hr'g Tr. 10:17–23 ("[T]he evidence before The Court is a declaration that Mr. Lang filed . . . [t]hat he attended the mediation, and that Crotty refused to close because of the title problems that have been raised in the course of the binders that we are now familiar with.")[13]  Plaintiff's final piece of evidence is the February 28, 2023, Settlement Agreement between Plaintiff and Crotty.  *See* Settlement Agreement, ECF No. 91-21; *see also, e.g.*, Pl's Reply 7 (citing Settlement Agreement).  The Settlement Agreement states that "certain disputes ha[d] arisen regarding the Purchase Agreement between [Crotty] and [Plaintiff], in connections with claims that, among other things, question regarding [sic] the title to Property," and that "[Crotty] identified certain objections to title to the Property within the meaning of Paragraph 15 of the Purchase Agreement."[14]  Settlement Agreement 2.  The Settlement Agreement, when coupled with the other evidence, establishes that Crotty refused to close because of, "among other things," "questions regarding the title" and "certain objections to title" that arose after Fidelity's issuance of the

---

[13] "There is . . . no rule against self-serving affidavits or declarations."  *Union First Mkt. Bank v. Bly*, No. 3:13-cv-598, 2014 WL 496657, at *8 (E.D. Va. Feb. 6, 2014) (citing *Harris v. Mayor & City Council of Baltimore*, 429 F. App'x 195, 198 n.5 (4th Cir. 2011)).  Thus, the Court may consider Lang's declaration as evidence in conjunction with Plaintiff's other evidence at this stage.  *See Harris*, 429 F. App'x at 198 n.5; *cf. J & J Sports Prods., Inc. v. Hernandez*, No. 1:11-cv-749, 2013 WL 5937909, at *3 (M.D.N.C. Nov. 5, 2013) ("[A] court need not discount a party's apparently self-serving affidavit.  Although many courts have disregarded self-serving affidavits that contradict prior sworn statements of the affiant as sham affidavits, Plaintiff does not allege any inconsistency between Defendant's sworn declaration and any prior sworn statement." (internal citations omitted)).

[14] Fidelity argues that this latter statement in the Settlement Agreement is "immaterial" because it "[c]learly" is just "a *post facto* justification calculated to bolster Landfall's litigation position."  Def.'s Mem. Supp. 15 n.12.  Fidelity does not cite any authority or evidence to explain why this "[c]learly" must be so; its only justification is that "[t]he Settlement Agreement was drafted and executed days after Fidelity issued its letter denying coverage with respect to the Drainfields."  *Id.*  Landfall's response, which Fidelity never contests, is that it could not settle the case at mediation nor execute the release until after Fidelity had denied coverage.  *See* Pl's Resp. 5.  *See generally* Def.'s Resp.; Def.'s Reply.

Fidelity gives the Court no valid basis to ignore this evidence of Crotty's reasoning for not closing.  Furthermore, Fidelity never directly addresses Plaintiff's other evidence (the e-mail from Crotty's attorney and Lang's Declaration) which also shows that Crotty had title questions and stemming from the Second Binder that caused the deal to fail.  *See generally* Def.'s Mem. Supp.; Def.'s Resp.; Def.'s Reply.

Second Binder. *Id.*; *see also, e.g.*, Pl's Mem. Supp. 7 ("Crotty withdrew because of the defects now in litigation." (citing Decl. Daniel Lang)).

As its only evidence that Crotty backed out because of zoning issues, and not perceived title issues, Fidelity points to Crotty's Termination Notice, ECF No. 91-16. *See* Def.'s Mem. Supp. 18 (citing Termination Notice); Def.'s Reply 11–12 (citing Termination Notice); Def.'s Resp. 15 (citing Termination Notice). Fidelity argues that Crotty refusing to close due to zoning issues would not trigger the "Unmarketable title" Covered Risk as that term is defined in the Insurance Policy, *see, e.g.*, Def.'s Mem. Supp. 16, and in neither of Plaintiff's two briefs filed after Fidelity made this contractual argument does Plaintiff respond to it (instead, Plaintiff's only response is that Crotty's refusal to close was, as a factual matter, not due to zoning issues), *see* Pl's Resp. 5; Pl's Reply 6–7. Accordingly, the Court finds that the Plaintiff has abandoned any potential claim that Crotty refusing to close due to zoning issues could give rise to Fidelity's breach of the Policy and entitle Plaintiff to summary judgment. *See, e.g.*, *Ruddy v. Bluestream Pro. Serv., LLC*, 444 F. Supp. 3d 697, 714, 715 n.34 (E.D. Va. 2020) (explaining that the plaintiff's failure to respond to an argument the defendant made in its motion for summary judgment was "grounds for the Court to deem th[e] argument[] conceded" by the plaintiff); *Rodgers v. Eagle All.*, 586 F. Supp. 3d 398, 448 (D. Md. 2022) ("A plaintiff who fails to respond to an argument for summary judgment is deemed to have abandoned the claim."). The Court thus does not consider such potential zoning claim further in determining if Plaintiff has established breach on the basis of Covered Risk 3.

However, Fidelity's zoning evidence does not contradict Plaintiff's evidence regarding Crotty's title concerns. Fidelity is correct that Crotty's Termination Notice cited to Paragraph 23 of the purchase contract. *See* Termination Notice. And Fidelity is correct that Paragraph 23 of the contract deals in part with zoning issues and Crotty receiving approval to build from Lancaster

County.  *See* Crotty Contract ¶ 23 ("This contract is contingent on the Purchaser verify [sic] that Lancaster County will still allow the planned site to be built in the configuration as shown on the plat provided by Emily Cartell on 11/14/2021.").  But the Termination Notice did not state that Crotty was terminating *solely* because of Paragraph (or Section) 23 and zoning issues, to the exclusion of all other issues.  Rather, Crotty stated that he was terminating "[p]ursuant to the provisions of the Contract, *including without limitation* Section 23."  Termination Notice (emphasis added).  So, the Termination Notice explicitly allows for other issues to have played into Crotty's decision to terminate, including—as the e-mail, Lang's declaration, and Settlement Agreement evidence—alleged questions Crotty had about title.  *See* Settlement Agreement 2; Decl. Daniel Lang ¶ 5; *see also* Myrtetus E-mail.  Thus, Fidelity's evidence does not create a genuine dispute as to the material fact that Crotty terminated in part because of "alleged or apparent" title questions stemming from the Second Binder.

The undisputed facts reveal that Crotty refused to close (at least in part) because of questions Crotty had about the validity of title to Lots 9 and 10 that were raised by the Second Binder that Fidelity issued.  Even viewing the facts in the light most favorable to Fidelity, the facts show that Crotty rescinded the contract at least *in some part* due to alleged or apparent questions about title which, under Virginia law, would entitle him to back out of the purchase.  That is all Plaintiff need show to establish Fidelity's liability for breach under this theory of liability and entitle Plaintiff to summary judgment.[15]

---

[15] Perhaps because it cannot, Fidelity never forwards an argument that its obligation to pay out under the Policy due to the occurrence of the "Unmarketable title" Covered Risk is contingent on a prospective purchaser refusing to close *solely* because of title issues.  *See generally* Def.'s Mem. Supp.; Def.'s Resp; Def.'s Reply.  All that the Policy requires is that the insured "sustain[] or incur[]" some "loss or damage . . . by reason of:" the Covered Risks.  Insurance Policy at 9.

For these reasons, the Court concludes that Plaintiff has established the occurrence of the "Unmarketable title" Covered Risk as a matter of law.  Thus, the Court will grant Plaintiff's motion for summary judgment on the issue of Fidelity's liability for breach of the Insurance Policy because Fidelity, after issuing the Second Binder that rendered title unmarketable under the Policy's controlling definition, did not fulfill its contractual obligation to compensate Plaintiff or otherwise cure the problem.  *See* Coverage Letter; Reconsideration Denial; *see also* Pl's Resp. 2.  In accord, the Court will deny Fidelity's summary judgment motion.  The question of how much of Crotty's refusal to close due to the Second Binder is attributable to alleged questions about title as opposed to questions about zoning goes not to liability, but to damages.   To the extent that Crotty did not close because Fidelity's Second Binder made it appear to him that there was doubt as to title, Fidelity is liable to Plaintiff for breach for not paying out under the Policy.  To whatever extent that Crotty also did not close because the Second Binder raised alleged zoning questions, however, Fidelity is not liable.  In other words, Plaintiff is entitled to recover from Fidelity damages in the amount of the percentage of the total loss that Plaintiff suffered that is attributable to Crotty's refusal to close due to alleged title questions only.  The determination of what that percentage is, again, is one to be made by the jury at the damages stage.

## IV. CONCLUSION

For the foregoing reasons, the Court will grant Plaintiff's renewed Motion for Summary Judgment and deny Defendant's renewed Motion for Summary Judgment.

An appropriate Order shall issue.

_____
/s/
Roderick C. Young
United States District Judge

Richmond, Virginia
Date: October 2, 2023

30